UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROBERT THOMPSON,
  *Petitioner*,

  v.

CONNECTICUT COMMISSIONER OF
CORRECTIONS,
  *Respondent.*

No. 3:21-cv-1584 (VAB)

**RULING AND ORDER ON MOTION TO DISMISS**

Robert Thompson ("Petitioner"), an inmate incarcerated at Cheshire Correctional Institute in Cheshire, Connecticut, brings a *pro se* petition for a writ of habeas corpus under 28 U.S.C. Section 2254. The Connecticut Commissioner of Correction ("Respondent") moves to dismiss because the petition is untimely.

For the following reasons, the motion to dismiss is **GRANTED.**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On December 9, 2010, a jury found Petioner guilty of first degree kidnapping, first degree secual assault, and second degree threaterning. Petition for Writ of Habeas Corpus, ECF No. 1 (Nov. 29, 2021) ("Pet.") at 2. After the jury trial, Mr. Thompson appealed his conviction to the Connecticut Appellate Court. *See State v. Thompson*, 76 A.3d 273 (Conn. App. 2013), *cert. denied*, 81 A.3d 1182 (Conn. 2013).

During its review, the Connecticut Appellate Court adopted the following facts:

> At approximately 11 p.m. on November 14, 2008, as the complainant, V.D., was walking home from a visit to her son's house, she encountered the defendant walking toward her on Sherman Avenue in New Haven. V.D. and the defendant, who were not previously acquainted, introduced themselves to one

1

another and struck up a casual conversation. The defendant told V.D. that he lived with his sister, a pastor, who was currently recruiting people to join her church. For that reason, he asked V.D. if she was interested in meeting his sister. Because V.D. enjoyed attending church, she agreed to go with the defendant to meet his sister. V.D. and the defendant walked together to his sister's house, which was located on Willis Street in New Haven.

Upon arriving at the house, to which he had no key, the defendant left V.D. on the front porch while he walked to the side of the house to knock on a window. After rejoining V.D. on the porch, the defendant knocked on the front door, which was promptly answered by a young boy who unlocked it to let them inside. Upon entering the house, V.D. and the defendant walked through a small hallway into the living room, where the defendant told V.D. that his sister would join them. V.D. sat on the living room sofa while awaiting the arrival of the defendant's sister.

Shortly thereafter, however, the defendant returned to the living room alone, explaining that his sister would not be joining them because she was asleep. V.D. replied that if she could not meet the defendant's sister, she would be leaving. She then rose from the sofa and began to walk toward the front door. As she did so, however, the defendant positioned himself between her and the door, blocking her exit and stating that she "wasn't going nowhere." As they stood by the door, V.D. asked the defendant, "[W]hy?" The defendant responded by ordering her to "shut up" and take off her clothes. Again, V.D. asked the defendant, "[W]hy?" This time, the defendant responded by punching her in the nose, causing her to bleed. The defendant then pushed V.D. several times toward the living room. Although V.D. attempted to resist him, the defendant ultimately succeeded in pushing her back into the living room. There, while they were standing near the sofa, the defendant once again ordered her to undress. When V.D. initially balked, the defendant grasped a nearby object and warned her that if she refused to undress or she made any noise, he would kill her. Fearing for her life, V.D. acquiesced and undressed, while the defendant simultaneously removed his clothing. As V.D. stood naked at the edge of the sofa, the defendant struck her in the mouth, causing her to "[stand] there swallowing the blood." The defendant then tossed V.D. a shirt to wipe the blood from her face and ordered her to lie on the sofa. Afraid of the defendant, V.D. complied.

After V.D. lay down, the defendant ordered her to open her legs. When she did so, he lay down on top of her. As V.D. lay on her

2

back, swallowing blood, the defendant forced her to engage in vaginal intercourse with him. When he was finished, he stood up and ordered V.D. to lie with him on the floor. Once again, she complied. As the defendant and V.D. lay naked on the floor, the defendant restrained her by placing his arms around her waist. When she attempted to move away from him, the defendant restrained her further by pulling more tightly at her waist. As a result of the defendant's strong grasp, V.D. could only move one of her arms. While lying on the floor, V.D. noticed the defendant's pants lying nearby. In an attempt to discover his identity, she removed the wallet from his pants and took his social security card from the wallet. Eventually, when V.D. believed that the defendant was asleep, she moved his arm slightly. When he did not respond, V.D. stood up, dressed and went to the bathroom to wash her bloody face.

After leaving the bathroom, V.D. entered the bedroom of Deborah Thompson–Savage, the woman she believed to be the defendant's sister, and woke her, explaining: "[M]iss, Miss, I need your help, your brother told me that you [are] a minister and I need your help.... [Y]our brother raped me...." Thompson–Savage immediately got up and accompanied V.D. into the living room, where she found the defendant lying naked on the floor. With V.D. standing behind her, clutching the back of her shirt, Thompson–Savage woke the defendant and asked him: "[W]hat did you do?" The defendant then rose and, upon seeing V.D., lunged toward her. Thompson–Savage blocked his lunge, however, and pushed V.D. toward the door, telling her to "go get help."

Fleeing the Willis Street house, V.D. ran to Dixwell Avenue, where she found a New Haven police officer. V.D. reported the sexual assault to the officer and gave him the defendant's social security card. To investigate V.D.'s claim, the officer drove her back to Willis Street, where she pointed out the defendant's sister's house. She was then transported to the Hospital of Saint Raphael, where she was treated for her injuries and a sexual assault kit was performed on her. Subsequent laboratory analysis revealed that V.D. was a DNA contributor to blood found both in the bathroom sink of the Willis Street house, and on a sofa cushion, a polo shirt and a T- shirt found at that location. Laboratory testing of seminal

> fluid found on a sofa cushion in the house revealed that its DNA
> profile was consistent with the defendant's known DNA profile.

*Id.* at 277–80; Pet. at 3.

On October 1, 2013, the Connecticut Appellate Court affirmed the conviction. *Id.* Raising the issues of ineffective assistance of counsel, as well as evidentiary issues, Mr. Thompson petitioned for certification with the Connecticut Supreme Court, which it denied. *Id*. While his direct appeal was pending, Mr. Thompson filed his first state habeas petition on the grounds of ineffective assistance of counsel. Pet. at 5–7; Memorandum in support re Motion to Dismiss, ECF No. 22 (May 5, 2023) ("Mem.") at 4. In 2016, the state court denied the habeas petition*. Id.* Mr. Thompson appealed the denial, and the Connecticut Appellate court affirmed. *Thompson v. Commissioner of Correction*, 194 A.3d 831 (Conn. App. 2018).

The Connecticut Supreme Court denied certification on October 17, 2018. Pet. at 9–10; Mem. at 4–5. On September 24, 2019, Mr. Thompson filed a second state habeas petition on the grounds of inadmissible evidence, ineffective counsel, and prosecutorial misconduct. Pet. at 5–7.

On June 17, 2021, he withdrew this second state habeas petition on June 17, 2021. Mem. at 5.

On November 29, 2021, Mr. Thompson filed this federal *pro se* petition for Writ of Habeas Corpus. *See* Pet.

On May 5, 2023, Respondent filed a Motion to Dismiss, ECF No. 21 (May 5, 2023), and a memorandum in support of the motion. *See* Mem.

On June 1, 2023, Mr. Thompson filed his response to the motion to dismiss. *See* Response to Motion to Dismiss, ECF No. 26 (June 1, 2023) ("Response").

## II. STANDARD OF REVIEW

"District courts review a motion to dismiss a petition for writ of habeas corpus according to the same principles as a motion to dismiss a civil complaint under Fed. R. Civ. P. 12(b)(6)." *Marra v. Cook*, No. 3:18-CV-389 (SRU), 2019 WL 4246927, at *1 (D. Conn. Sept. 6, 2019) (citing *Purdy v. Bennett*, 214 F. Supp. 2d 348, 353 (S.D.N.Y. 2002)).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal citations omitted). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the

plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

A pro se petition "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). But a pro se petition still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Ashcroft*, 556 U.S. at 678).

### III.   DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") restricts the ability of prisoners to seek federal review of their state criminal convictions. *Smith v. McGinnis*, 208 F.3d 13, 15 (2d Cir. 2000). AEDPA provides a one-year statute of limitations for federal habeas actions filed by prisoners in custody pursuant to a state court judgment. 28 U.S.C. § 2244(d)(1); *Murphy v. Strack*, 9 F. App'x 71, 72 (2d Cir. 2001). The one-year limitations period

runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

"The Second Circuit has held that the one-year statute of limitations period imposed by AEDPA for filing a federal habeas petition does not begin until the completion of direct appellate review in the state courts and either the denial of a petition for certiorari by the United States Supreme Court or the expiration of the time within which to file a petition for a writ of certiorari." *Edwards v. Choinski*, No. 305CV444MRK, 2005 WL 3334442, at *2 (D. Conn. Dec. 5, 2005) (citing *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir.2001)). A state habeas action or other form of post-conviction review tolls or interrupts the running of the limitation period. 28 U.S.C. § 2244(d)(2); *Smith*, 208 F.3d at 17. When the state post-conviction review terminates, the "clock restarts" and the limitation period resumes. *Holland v. Florida*, 560 U.S. 631, 638 (2010) (citing *Coates v. Byrd*, 211 F.3d 1225 (11th Cir. 2000)).

Respondent argues that the petition for habeas corpus is time-barred because a total of

7

417 non-tolled days passed before Mr. Thompson filed. Mem. at 8. Respondent argues that the statute of limitations tolled on January 15, 2019, which was ninety days after the Connecticut Supreme Court denied certification on appeal from the state court's denial of the first habeas petition—and when the deadline to petition the United State Supreme Court passed. *Id*. Mr. Thompson filed another state habeas petition 252 days later on September 24, 2019, and he withdrew it on June 17, 2021. *Id*. Then 165 days later, Mr. Thompson filed this federal habeas petition on November 29, 2021. *Id.* Respondent concludes that 417 days (252 + 165) of non-tolled time passed before the filing of the federal petition—which exceeds the one-year (365 day) statutory period*. Id.*

In response, Mr. Thompson argues that his petition is not time-barred because he filed a second state habeas petition on September 24, 2019, on newly discovered evidence, but then his attorney died in January 2020, and his new counsel was ineffective. Response at 11. Mr. Thompson claims that he withdrew his second state habeas petition on June 17, 2021, in order to file this federal habeas petition—therefore, when he filed it on November 29, 2021, the one-year deadline had not lapsed.

The Court disagrees.

While Mr. Thompson uses the phrase "newly discovered evidence" in his filing, he does not rely on newly uncovered evidence in his second state habeas petition, as AEDPA requires. 28 U.S.C. § 2244(d)(1)(D) ("one-year limitations period runs from [ ] the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence"); *see also Jaynes v. Jesus G.*, No. 3:21-CV-660 (SVN), 2022 WL 2065014, at *3 (D. Conn. June 8, 2022) ("The Court further holds that the untimely petition is not saved by application of the tolling rules"). After his conviction in 2010, Mr. Thompson appealed, a

conviction affirmed by the Connecticut Appellate Court in 2013. He then filed his first state habeas petition on grounds of "inadmissible prejudicial testimony in front of jury, ineffective counsel, [and] prosecutorial misconduct." Pet. at 6. Mr. Thompson then based his second state habeas petition upon another "ineffective assistance of counsel" argument. *Id*. at 10. This second ineffective assistance of counsel argument is based on his first attorney allegedly having died in January 2020, and his new counsel allegedly having failed to find transcripts and other relevant discovery. Resp. at 11.

But these alleged failures cannot be a factual predicate for the second state habeas petition filed in September 2019 because they occurred after January 2020. In other words, 252 days had already lapsed when Mr. Thompson filed his second state habeas petition in September 2019. And Mr. Thompson does not dispute that 165 days had already lapsed between when he withdrew the second state habeas petition on June 17, 2021, and when he filed this federal habeas petition on November 29, 2021. As a result, 417 days, 252 days before the filing of the second state habeas petition, and 165 days after the withdrawal of the second state habeas petition, had lapsed by the filing of the federal habeas petition, a period in considerable excess of the AEDPA's statute of limitations of one year. *Cf. Marra,* 2019 WL 4246927, at *7 ("[A] total of 602 days (or one and eight months) elapsed between the finality of the judgment and the filing of the instant petition when there were no actions pending in state court challenging [the underlying conviction]."); *Jaynes,* 2022 WL 2065014, at *4 ("[B]ecause the one-year grace period had long expired by the time Petitioner filed the present federal habeas petition, the petition is time-barred.").

Accordingly, Mr. Thompson's federal habeas petition is time-barred.

IV. **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is **GRANTED.**

The Clerk of Court is respectfully directed to dismiss the petition and to close this case.

The Court further concludes that an appeal of this order would not be taken in good faith. Thus, a certificate of appealability will not issue. *See* 22 U.S.C.§ 2253(c); Fed. R. App. P. 22(b)(1).

**SO ORDERED** at New Haven, Connecticut, this 5th day of January, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE